May it please the Court, my name is Roger Townsend. Mr. Townsend. I represent Ian Eisenberg, sitting at a counsel table, and two corporate defendants, Olympic Telecommunications and French Dreams. Also here for defense counsel, and we'll be splitting our time, is Mr. Ernest Leonard, who represents the Chris Hebert defendants. Mr. Leonard, how do you allocate the time, or do you plan to allocate the time? We have, I will, and I've been told to police myself here that I have eight minutes to start, and then we're going to reserve four minutes for rebuttal, so we'll split. 8-8-4? 8-8-2-2, if possible. Let's hope it works out then. Yeah. All right. Go ahead. We will move quickly. May it please the Court, I have two primary asserted grounds upon which this Court should reverse the summary judgment ruling of the district court. One is that the solicitation check mailings in question in this case were whether or not they were sufficient to establish a binding contract with consumers. The basis of the district court ruling below was that the statements on the back of checks, which when negotiated by consumers, established an ongoing service relationship for Internet services, was not conspicuously displayed to the consumer. There's no dispute that it was the language in the – contained on the back of the checks and in the mailings themselves contained sufficient information by which a reasonable consumer would determine that this is a – that this is a contractual relationship. But you'd never know that from looking at the front of what looked like an invoice and a refund of $3.50. That was the finding of the district court. I submit that that is not a distinction that has basis in the law, that that – the invoice-like form or the disclaimer on the front of the check as opposed to the back of the check was the basis for the decision below. I submit to this Court that if anything, the rule should be the opposite, that the consumer should know more from the back of a check from the endorsement place where you actually actively have to take some step in order to negotiate the instrument, that that – that the back of the check is where a stamp occurs, a signature occurs, where the consumer, be it a small business or an individual, will know to look for terms. What significance do we attach to the fact that a lot of people who endorsed the check didn't even use Internet service? Well, I think that that is a relevant – a relevant fact. I don't – I do not think that that's sufficient to defeat the legality of the endorsement checks, of the solicitation checks. The solicitation checks – the defendants in this case sent out solicitation checks which they believed were lawful. And they, by the way, consulted with respected law firms, marketing groups, including one that was headed by the subsequent head of the FTC, to make sure that these checks passed muster. So that they negotiate – the consumers negotiate the check, they send out CD-ROMs that they have to pay for and that they make a basis, a reasonable reliance upon the negotiation of the check. The fact that the consumer response rate was – or the usage adoption rate was low is not dispositive. And I think that if you look at – Well, what inference do we draw from it? The inference that we draw is – is just that. I mean, it's one of a question of fact, whether or not it's – it is an indication, I believe, that certain consumers negotiate the check and may or may not have intended to utilize the service. I don't know that you can necessarily say that if someone negotiates a check, doesn't utilize the service – Well, it's not just someone. It's a bunch of someone's. Correct. Correct, Your Honor. There were consumers that negotiated the check that didn't utilize the service. That's correct. But that's true with any solicitation check program. The FTC – There's a certain percentage of them, I think, is what I understand the question to relate to. Wasn't there a high percentage? Well, I think, Your Honor, once we start talking percentage – It does show that there are facts, and my co-counsel will speak to the evidentiary component of that, because I think he has some good arguments that that evidence is unreliable. There is evidence in the record about rates, and I don't know them off the top of my head. Let me ask this. In terms of what's undisputed in the record, as I understand it, it's a summary judgment against your client, so your client should get the benefit of any disputed fact or any reasonable inferences in the favor of your client. Just in terms of what's undisputed, what came with this check? In other words, when the consumer opens a letter that they get, I assume it's in a letter. Correct. They're getting an envelope. It's got a check. What else is in there with the check? It's a mailing that's attached to a serrated invoice-like form, and then there are, like you would see in your credit card bill, there are inserts. And then the inserts have in there statements which are advertising in nature and which include more detailed contractual language. The undisputed fact is that the contractual language in there is sufficient. It's the invoice-like form that was the basis of the district court. Do you have handy the ER site to this insert that you're talking about? I do. If not, we'll find it. I believe it's ER 1035, and I'll check it when my time is up. But looking at the face of this check and invoice, I don't see anything similar to the disclaimer that was in the survey that was done that said be sure and look at reverse side of check or something like that. There's nothing like that on the face of it, is there? Well, and the survey stands for the proposition that the language itself, when read by the consumer, is sufficient. The language on the back of the check. On the back of the check. Okay. But in the survey, it is not true that there was some sort of a reference on the face which brought attention to the fact that the consumer ought to look at the back of the check? I don't believe that to be the case, Your Honor. Really? My understanding of the survey was that the surveys were brought to consumers and that they did a random sample in, I believe it was a shopping mall in the Washington, D.C. area, and that they provided copies of the checks, and then they were asked questions about whether they provided copies of the back of the check or both sides or an invoice similar to this. Well, I believe it was the whole mailing is my understanding. The whole mail. Yeah. And I have 23 seconds before I want to cede to my colleague before I sit down. And I want to make one other point, which is we spent a lot of time on our brief, which is the relevance of the back of the check rule, and I believe that there's been some back and forth with that with the FTC. The significance of the back of the check rule is that the reasonable consumer should know, and I believe there's a lot of case law that establishes that the existing, that the back of a check is a legitimate means for which to establish contractual terms with a consumer. And the FTC concedes this point. They say there's a difference between those legitimate solicitation check mailing systems and what you're doing here, but there's no basis by which to make that distinction. That distinction is one which parties going forward will have a very difficult time determining what's an MCI-like mailing or something you might get from your credit card, which assigns you up for insurance or something of the like, and what's happening here. I submit to you that these things are not legally distinguishable when you look at them, and that I'll also say that the fact that they're on an invoice-like form actually supports our argument, because the invoice-like form and the back of the check rule, the back of the check rule applies when there is an ongoing relationship. An invoice-like form tells the consumer that there is, appears to be an ongoing relationship. So that supports our argument. Thank you, counsel. Thank you. Good morning. May it please the Court. My name is Ernest Leonard, and I represent two of the defendants, Christopher L. Hubbard and Kodos Settlement. Kodos Settlement is a trust that I understand is no longer in existence, but it was used as an ownership vehicle of these companies. I would like to spend my limited time, with the Court's permission, addressing an issue that's unique to my clients, which is the absence of evidence to support the damages found against them by the district court. Before we get to that, let me just say, is there any issue here with respect to whether we can determine, or for that matter the district court could determine, a violation of Section 5 as a matter of law? Is there any suggestion that there has to be a finding of fact made first, and then the question is, on review, was that within the scope of Section 5? I was not able to find cases that clearly address that. But I believe that what the district judge did is he looked at a lot of facts and then said, based on these facts, I find as a matter of law that the programs were unclear in the statute. Uncontroverted facts. In other words, this was summary judgment. This wasn't a bench trial. Well, and what Mr. Towns had referred to earlier was one of the facts that the Court found uncontroverted, that was very controverted, was what Your Honor had referred to as the usage. The FTC presented an affidavit of one of their own employees who summarized a bunch of invoices from a company called Starnet. Starnet was deposed, a corporate deposition. Two individuals were put forward. We took – I personally cross-examined them, and both of those individuals admitted they had no knowledge or involvement in the process that went into putting together those invoices. They had no personal knowledge. I made those objections. The district court, without comment, simply overruled them. So to the extent that is a significant factor, which I believe it is because the district court and the FTC argued, look, only 1 percent of the people used it. Well, that was based upon unauthenticated hearsay. That's a different objection. You're saying there was a mistake in an evidentiary ruling. Did you have any other evidence that would contradict the evidence that you're challenging? No, Your Honor. That was correct. So if the evidence was properly admitted, that fact would be uncontroverted. That is correct. Okay. But with respect to the issue of damages, it's our contention that even if the district court's finding of liability was affirmed, there is no admissible evidence that supports the damages figures against the Hebbard defendants. The FTC – The what defendants? The Hebbard, my clients, Christopher Hebbard and the Cotto settlement. The FTC put on their case, their damages case, they closed their evidence, and there were no damages, no evidence as to damages. They're essentially the $17 million figure, which was just astounding to us because it just went against any sort of concept of what this program was producing, was based upon two – Produced a gross in the high 20 millions, right? That's correct. And, I mean, from my client's perspective, I think if he got one distribution, I think it was 1.1 million, and that could even pay the bills outstanding. And I think Mr. Eisenberg's distribution was similar. So to all of a sudden have these huge numbers thrown at us was very concerning, and it's significant that not one witness vouched for these numbers. The only two witnesses that had any comment as to the numbers that the FTC had calculated both said they were unrealistic. That was Mr. Dawson who said he'd be shocked if essentially the numbers were correct, and Mr. Ratner, an expert witness on billing, said there's no way a program like this could generate the type of percentages that the FTC was contending. Not one witness vouched for the credibility of these numbers. These numbers came from two sources. There were two billing companies. One was Olympic. Olympic is owned or controlled by Mr. Eisenberg. The record's very clear that Mr. Hebert had no control, management, or anything to do with that company. The other source was Integritel, which was an outside party. What was particularly concerning was the FTC made the strategic decision in their case, even though they had designated Integritel records as trial exhibits at the time, and I cited a record site where I made it very clear they're not putting on these documents. The FTC said, no, we're not. Those documents were never put in the evidence. We objected strongly at the post-trial brief, and the district court's ruling just kind of shrugged off saying, well, they really weren't in dispute. Well, we didn't stipulate that to it. There is no evidence. So that Integritel records, there is zero evidence in the records that supports those numbers, that calculation. Didn't Ken Dawson authenticate the records in some fashion? Ken Dawson had a test. What was in the record was his deposition, which he was discussing the records, but not in any sort of specific. He mentioned at one point in the deposition the gross number of, I think it was the gross number of 693, but the numbers that they had actually, the FTC had used in their argument, which was taking this number, calculating, doing all the calculations, there's nothing in the record on that. That's pure argument and pleadings. And I've read his deposition line to line, and there's nothing, he makes vague references, but there's nothing that would support the admissibility of those records by someone with personal knowledge who can testify and vouch as to their credibility and as to their accurateness. Now, Olympic, 97 percent of the numbers came from Olympic's records. Those were documents called payment summaries, and the judge admitted those under the party admission rules. And as I laid out in my briefing, that may be, those documents certainly are good against Olympic. They may even be admissible against Eisenberg entities, but they're not admissible against the Hebert entities. There's certain exceptions within the party admission rule in which a statement of someone else can be imputed against a party. What is your client's exposure? Out of the 17-plus million, what is your, is it joint? Yes, sir. It's completely joint. Never mind. And so those documents under all of the ‑‑ Okay, I hear you. Even if they are not admissible as admissions, why are they not admissible as business records? Because this Court has held in the, they don't fit the requirements of 8036. And this Court has held in the U.S. v. Caterbrand case what those requirements are, which is pretty much what the rule says, which is the records are made or based on information transmitted by a person with knowledge at or near the time of the transaction. No evidence as to that. Made in the ordinary course of business. And they are trustworthy with neither the source of the information or method or circumstances of preparation indicating a lack of trustworthiness. The district court did not hold they fell within the exception. The district court simply commented they were used in the records. I think the FTC has recognized that the foundational requirements of the four-party admission rule don't apply, so they stressed in their briefs that these are business records. And their rationale was, well, the Hebert defendants relied upon them and used them. That is not the business record exception. There's very clear foundational requirements that the FTC as the proponent has to meet, and they simply were not met there. They were just put in bald-faced documents that with the closest they came is Mr. Reese, a former employee of Mr. Eisenberg, looked at six of them and just said, yeah, those are our types. And he said we're defendants going to save any time here for rebuttal argument? Yes, Your Honor. I'm sorry. You're down to below three minutes. Okay. Thank you, Your Honor. Thank you. We'll hear from the FTC. May it please the Court. I'm Marilyn Kirst on behalf of the FTC. Kirst. As several comments from the Court recognized, the solicitation package as a whole is what we're talking about that was deceptive. And the district court found as a matter of law that it was deceptive. Correctly so. This Court in the Gill case, and also in several other unpublished decisions that I can cite if the Court wishes, and other circuit courts have upheld summary judgment rulings on the issue of deceptiveness as a matter of law. It's an objective standard likely to deceive reasonable consumers, likely to deceive consumers acting reasonably under the circumstances. And here what the district court had were several examples of these solicitation packages, an envelope that might come from your bank or somewhere else with a bunch of glossy brochures, throw them out, and then an invoice attached to a check. And you look at the front of the invoice, it appears to be a refund of some kind, tear perforation, turn it over, sign it or stamp it, and you have signed up for Internet services that perhaps you didn't know you wanted. You didn't have a computer, perhaps. You already had an Internet service provider. The depositions and declarations of consumers in the record show that there were a variety of reasons why these people, these 99 percent of the people who deposited the check and never used the service, had no idea. Alito Is there any such thing as an FTC regulation that deals with this kind of solicitation? There is not. The closest thing is the doctrine that if you have a disclaimer, it can't just be in fine print, and this is a judge-made doctrine, but it coincides, of course, with the FTC's views on the issue. It has to be clear and conspicuous. And the problem here that the district court recognized is that once you have looked at that invoice-like form, which is the face of the form, that's right, and you'll find the face at pages 1007 and 1034 of the excerpts of record. The opposite side is at the following page. Once you have looked at this face of the invoice-like form and seen words like invoice number, account number, discount taken, net discount, the overall net impression that you have received as a consumer acting reasonably under the circumstances has solidified. Once you flip it over, there's something in fine print. And, in fact, if you look at the fine print, not the version of it that was blown up for by the defendants for ease of reading, but if you look at the actual size of the fine print, which you will see in the record at 1008 and 1035, you have a longish block of fine print, and somewhere in the middle of that it says, by the way, that will be $29.95 a month. The word notice is capitalized. It is capitalized, Your Honor. That is true. Now, Your Honor asked about the consumer survey, and that's a very important piece of evidence that the district court looked at and discredited. And the reason for it was, and this is what Mr. Beals, the former FTC commissioner, testified, is that if you force attention to the disclaimer language, to the disclosure language on the back of the check, if you force a consumer to read it and you tell him, we're going to ask you questions afterwards, then it's clear. They do that. There was not, in the consumer survey, there was not a duplication of the circumstances under which a consumer, in his home, opening a piece of mail, a random piece of mail, would gather an overall net impression of this package. What they did was they accosted people in shopping malls. They went up to them. They presented them with the language that is on the back of the check. And they said the face, not the face. And they said, read this. What does it mean to you? And the result simply tells you, if you read it, it will be clear that you have just signed up for Internet service. The if you read it is the key. And when the overall net impression is not somebody is trying to sell me something, somebody is trying to advertise, tout their Internet services, and get me to sign up by giving me a month free service or something. If the overall net impression is instead, oh, somebody is, you know, giving me a little rebate or an account adjustment or something, the whole set of perceptions, the overall net impression, is conditioned by that, by the face of the check and the face of that invoice-like form. Ms. Gerst, I wonder if you would address the point Mr. Leonard made that the damage figures were not based on any kind of reliable evidence. Well, Your Honor, first of all, on the subject of the Integritel records that Mr. Leonard contends are not in the record, the Integritel records were discussed in Mr. Dawson's declaration. And Mr. Dawson's declaration was placed in the record, and this is at docket number 208, was our submission to the Court on the papers before the bench trial about how the amount of consumer redress should be calculated. And Mr. Dawson's declaration was Exhibit 401 to that. Now, that's the declaration, but what about the records themselves? The records themselves were attached to the declaration, and critically, the Hebbard defendants and the Eisenberg defendants did not object when those documents were presented to the Court in the pretrial briefing on the papers. And the Hebbard brief pretrial is in the docket at number 215. So that objection was waived. The district court very clearly said no one has seriously contested the Integritel records, and that's what the district court was relying on. There was extensive pretrial briefing on the issue of how the amount of redress should be calculated, and the Integritel records were in that pretrial briefing, as were the Olympic records, the payment summaries, and the deposition testimony of Mr. Dan Reese, who was the billing director for Olympic. And although the Hebbard defendants like to say that Mr. Reese didn't really do anything in his deposition with respect to those records, if you look at his deposition and this is Trial Exhibit 8, at pages 12 to 13, he identifies about 20 samples of these payment summaries, and then in the following pages of his deposition, testifies in detail about how the debt – how these payment summaries were used. How these payment summaries were generated in the regular course of business, how these payment summaries should be interpreted, and who checked them over for content and accuracy. So all of that was before the district court judge. The district court that said, I'm going to have a bench trial, and the pretrial order I think is at 234 in the docket. The pretrial order says, I want you especially to concentrate on the reliability and interpretation of the Olympic payment summaries. No mention in the pretrial order of the Integritel documents. Again, if the Hebbard defendants had a real concern with the accuracy of the Integritel documents, that was the time to say, Your Honor, we want a trial on that. They didn't. So that's not before the court, I would submit. On the issue of – if I may return to liability, unless there are other questions on the evidentiary – on the evidentiary points. On the issue of deception, the question is, these were not big enough. These disclosures were simply not big enough. The overall net impression was not that of a solicitation for services. As the district court correctly found, and the district court did look at the entire package, he correctly found that you can't just by stuffing the envelope with a few ads for something or other counteract the overall net impression of this invoice-like form that appears to be the business end of what you're trying to do. And that's not what you're – what you're sending to the consumer. If the Court has no further questions, I will go ahead. Kennedy, could you reference some case law on the original question of whether this is a matter of law rather than requiring a finding of fact? Because we are in a summary judgment. Yes, Your Honor. Well, first of all – first of all, the important concern is this is an objective standard. And the district court not only looked at the overall net impression, but also buttressed his conclusion about the overall net impression with those usage records from Starnet, which no one has challenged here on appeal, that show that 99 percent of the consumers who cashed the check never signed on for the Internet services, and buttressed his conclusions also with deposition testimony from consumers, one of whom didn't have a computer, the other of whom already had Internet services, and the third who had to use a magnifying glass to read the disclosures on the back of the check, plus declarations from consumers, about 30 or 40 declarations. And the district court weeded out all the hearsay statements in those declarations and relied only on what a consumer said about what he believed when he saw the package and what he did depositing the check. If it was somebody else, the district court discounted it. But the central question, this question, can a judge sitting on summary judgment look at the overall net impression and determine it for himself as a matter of law? The answer is yes. And this Court, in the Gill case, looked at telemarketing scripts, and one of the defendants says, I think it's the Eisenberg defendant, say, oh, the Gill case was just related to credit repair laws and rules, it was different. There is also a finding that it was deceptive within the meaning of Section 5A of the FTC Act, which is what we're doing here. Unpublished decisions of this Court, if the Court permits. Thank you. Not yet. The day will come, but not right now. I don't want to hear anything about unpublished decisions here or, frankly, elsewhere, in our circuit or elsewhere, but there's extra circuit authority of other circuits that goes the same way as Gill. Yes, Your Honor. And I'm interested in that because it may be pertinent to looking at Gill. Your Honor, the closest is a decision by Judge Bork in the Brown v. Williamson case in the D.C. Circuit, and the cite for that is 778 F. 2nd, 35. In that decision, Judge Bork. Is this in either of the briefs? Yes, it is, Your Honor. I believe so. In that decision, Judge Bork looked at the outside of a cigarette package, and the district court had done the same. And there were small print disclaimers about the way in which the tar content had been determined. But the big print was about the tar content, and it was deceptive. And the district court upheld the summary judgment findings of the circuit court upheld the summary judgment findings of the district court. And interestingly, Judge Bork said, yes, we know there are Lanham Act cases, for instance, about the mistaken impression that one product is another one. And for those, we require consumer survey data to show that there is some kind of risk of confusion. But this is not that. This is not the Lanham Act. This is a case in which consumer survey data isn't necessary in order to show that something is, that the overall net impression is deceptive. So that's the law that the district court was following, and that's the law that we submit the district court applied correctly to the undisputed facts. There was no dispute about what the submissions were like. All the exhibits that the district court looked at in order to determine deceptiveness came in attachment A to Ian Eisenberg's affidavit. So it wasn't as if the FTC was saying, no, no, the packages looked like this. This was all what the defendants themselves had submitted about their own packages. You have suggested that the inserts would likely be thrown away by the recipient. Does that affect this determination? Shouldn't we look at at least the actual insert to find out whether there is the dominant impression is that this is a solicitation for Internet services? Your Honor, if you do look at the inserts, which we submit was unlikely that the consumers who, the 99 percent who didn't sign on to the Internet, we assert that it's unlikely that they looked at those. If you look at them, they do advertise Internet services. And they do talk about, or at least some of them do, the terms on which these Internet services are being offered. But there's, the important link is not there between those brochures, which we all get with our bank statements, for instance, and we just assume don't have anything to do. We don't read our bank statements in light of the colorful brochures that come in this way. Scalia, I assume that somebody reads them. Otherwise, it wouldn't be, this practice wouldn't be followed. Yes, perhaps. But here, you don't have to show that this package, this package was likely to deceive most consumers. It's likely to deceive consumers acting reasonably under the circumstances. And there's no criterion that it's more likely than not to deceive them. There is no requirement that there be some majority of consumers who are deceived. What we do know from the StarNet usage evidence, which is uncontested here on appeal, is that 99 percent of the people who deposited the check made absolutely no use of this service that they had supposedly signed on for. Thank you, counsel. Thank you, Your Honor. Do we have some rebuttal time? Mr. Townsend, can you tell me in 25 words or less what fact is disputed? The whether or not reasonable, a reasonable consumer would read the back of the check. Isn't that a conclusion rather than a fact? Well, it's an application of fact to law. Well, isn't that what the judge does with undisputed facts? Well, I think the undisputed fact, I don't think that there is a record as to what a reasonable consumer would believe. I don't know that a judge, based on anecdotal evidence of some consumer complaints, can make a determination based upon what reasonable consumers would do. I think that that is a question of fact. I think it's the very essence of a question of fact. There's no dispute with respect to the invoice check and all of that. In the records, those are undisputed facts. Those are undisputed facts. Although I would call your attention to a couple of places in the record which address some of the questions that the Court asked earlier, which is the location of the We're focusing on the undisputed facts here. And this could be an extension of the obscenity area. But you look at this and you know it when you see it. This is either deceptive or not. Right. Isn't that kind of where we are? I think you the Court needs and parties need to know what a reasonable what standard will be applied when they engage in something like a solicitation check marketing program. The FTC hasn't been able to point to any law, rule, or regulation other than general deceptiveness upon which to differentiate the solicitation check mailings in question and the legitimate solicitation checks. And I still, having listened and read all the briefs and having participated in this case from the beginning, don't know where that line is. I think you're telling us that the judge was wrong as a matter of law rather than that there were disputed facts in the record. I think that I think you're telling us the judge came to the wrong legal conclusion based on the facts that he had in front of him. I think both are true. I think as a matter of law, including something that says, notice, this will commit you to $19.95 a month, is sufficient as a matter of law. I submit that the case should be reversed and that the defendants should prevail. But I think at the very least that we, that my clients should be afforded the opportunity to go before the court and make a record as to what a reasonable consumer can expect. Let me ask you about that. If Judge O'Scanlan doesn't object as presiding judge, I'm going to take you over your time. Go ahead, please, Judge. We have a reasonable person standard in a lot of areas of the law. It used to be called a reasonable man standard. Like if you read Oliver Wendell Holmes' The Common Law, we all studied it in torts. Normally, is my understanding, so if you have contrary authority, tell me what it is, but normally when you have one of these reasonable person standards, it's indicating there's some objective test being applied. I've never heard of there being a requirement of evidence of what a reasonable person does. You know, like expert testimony in a tort case, what would a reasonable driver have done? I mean, is there precedent that supports your idea that in the FTCA context, when we look at what's deceptive and what a reasonable consumer would believe, that there should be fact testimony about reasonable consumers? I think if you look to the Ninth Circuit FTC authority, other than the Gill case that the FTC cited, and I think that's distinguishable, in each instance there's a trial that goes on and there's an opportunity to place a record as to what And it may well be, and I'm not submitting to the Court that you need to bring in all the consumers. I couldn't do that, but I suppose you could have an expert who says, I'm a consumerist or something, and in my opinion, a reasonable consumer would do such and such. Right. And they could have that in a tort case. You say a reasonable driver should do such and such. But I've never heard of that or seen precedent on that. As to what a reasonable, I mean, I think that that, if that's a disputed question of fact in the tort case, as to what a reasonable driver would expect and do, I think that you would be entitled to have someone who could testify, and I don't know what position that is, but as to what a reasonable driver would do. It seems to me in that context that the jury gets an instruction as to whether someone's been a reasonable driver. And that's something that the jury can do. The jury applies the facts that are undisputed to that legal standard. And I thought that's what Judge Silberman was posing in his question was, isn't that what the judge is doing here? He's applying a reasonable consumer test to the undisputed facts. Well, I think once the Court answered the question, I mean, I think that if it gets to the jury, we're past summary judgment. We're making a determination of fact. We're balancing. Currently, we can look at the undisputed facts, can't we? You can look at the undisputed facts and make, you can apply the summary judgment standard. I think if you look at undisputed facts and you say that a reasonable consumer, and I think there's more than adequate record to say that a reasonable consumer would know to read the back of a check and would know that this is a reasonable means to do it. But we can do that looking at the undisputed facts in this case. Correct. Applying a summary judgment standard, I think, is step two. You've got to get through that. And I think as a matter of fundamental fairness, allowing defendants to have their case set, I think it's worth noting that we had a trial on this case. It's only as to the issue of damages and not as to the issue of liability. I think the Court's well aware of that. And I would like to make one point. Well, we've let you go way over time, so. Thank you. And I thank you very much. The case just argued will be submitted for decision.
judges: O'scannlain, Silverman, Gould